Lauren M. Rule (ISB # 6863)
Kristin F. Ruether (ISB # 7914)
ADVOCATES FOR THE WEST
PO Box 1612
Boise ID 83701
(208) 342-7024
(208) 342-8286 (fax)
lrule@advocateswest.org
kruether@advocateswest.org

Attorneys for Plaintiff Western Watersheds Project

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, | ) | |
| | ) | No. 09-cv-611-CWD |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **FIRST AMENDED COMPLAINT** |
| DAVID ROSENKRANCE, BLM Challis Field | ) | |
| Office Manager, and BUREAU OF LAND | ) | |
| MANAGEMENT; FRANK GUZMAN, | ) | |
| Salmon-Challis National Forest Supervisor, and | ) | |
| UNITED STATES FOREST SERVICE; | ) | |
| GARY BURTON, U.S. Fish and Wildlife Service | ) | |
| Snake River Office Field Supervisor, and | ) | |
| U.S. FISH AND WILDLIFE SERVICE; and | ) | |
| DAVID MABE, NOAA Fisheries Idaho State | ) | |
| Habitat Office Supervisor, and NOAA FISHERIES, | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

1.      The Upper Salmon River basin in Idaho historically was an important and

productive area for salmon, steelhead, and bull trout; but these species have declined

dramatically throughout the basin.  These fish inhabit the mainstem Salmon River as well as

many tributaries, including tributaries within the Morgan Creek, Challis Creek, Garden Creek, and Bayhorse Creek subwatersheds at issue here.  Plaintiff Western Watersheds Project brings this case to challenge Defendants' violations of the Endangered Species Act ("ESA") in not properly managing for and recovering salmon, steelhead, and bull trout in the Morgan Creek, Challis Creek, Garden Creek, and Bayhorse Creek drainages.

2.     These subwatersheds drain roughly 491 square miles of the Salmon River Mountains in central Idaho, and empty into the Upper Salmon River between its confluences with the Pahsimeroi River and the East Fork Salmon River.  Much of the land in these subwatersheds is federal land managed by either the Bureau of Land Management ("BLM") or the Forest Service.  The predominant use of these lands is for livestock grazing, and water diverted from these public lands is used to irrigate private land pastures that help feed livestock that graze the federal allotments in the summer.

3.     BLM and the Forest Service consulted under the ESA with NOAA Fisheries and U.S. Fish and Wildlife Service over the impacts to salmon, steelhead, and bull trout from livestock grazing and other public land management activities (other than water diversions) throughout these subwatersheds, but these consultations are now almost ten years old.

4.     For purposes of those ESA consultations, the agencies grouped this portion of the Salmon River and these subwatersheds into a larger area, called the "Upper Salmon River Watershed."[1]  The agencies have not updated the Upper Salmon River Watershed consultations despite newly designated critical habitat for steelhead, changed circumstances such as the failure to conduct required monitoring or comply with grazing standards, and new information about the

_____

[1] Even though these subwatersheds do not form a true watershed because they each drain into the Salmon River separately, WWP will refer to the area covered by this group of subwatersheds as the "Upper Salmon River Watershed" for ease of reference and to be consistent with the agencies' designation.

FIRST AMENDED COMPLAINT - 2

activities in the subwatersheds, the status of the fish species, and impacts to those species, all of which warrant reinitiation of consultation for salmon, steelhead, and bull trout.

5.     With regard to water diversions, Western Watersheds Project previously sued the Forest Service for failing to consult over diversions on the Salmon-Challis National Forest and the parties settled that lawsuit, with the Forest Service agreeing to initiate consultation for all water diversions on that forest by submitting biological assessments on a watershed basis.  *See Western Watersheds Project v. Matejko,* No. 01-cv-259-BLW (D. Idaho, filed June 7, 2001) (Docket No. 18).  Pursuant to that settlement, the Forest Service submitted a biological assessment to NOAA Fisheries and Fish and Wildlife Service ("the Services") in 2004, assessing impacts to ESA-listed fish from water diversions on its land in the Upper Salmon River Watershed, but the Services have never issued biological opinions to complete consultation over those diversions.

6.     Meanwhile, BLM and the Forest Service continue to authorize livestock grazing and water diversions that adversely affect salmon, steelhead, and bull trout and their habitat in the Upper Salmon River Watershed.  Grazing in riparian areas and trampling of spawning gravels harms the listed fish and degrades their habitat.  Until the agencies complete new consultations, they must prevent adverse effects and injury to salmon, steelhead, bull trout, and designated critical habitat.

7.     Western Watersheds Project thus seeks judicial review and relief ordering Defendants to reinitiate consultation for activities in the Upper Salmon River Watershed, including livestock grazing; and further declaratory and injunctive relief to prevent BLM and the Forest Service from violating the ESA's substantive requirements to protect and recover these species of fish.

FIRST AMENDED COMPLAINT - 3

**JURISDICTION AND VENUE**

8.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the ESA, 16 U.S.C. § 1531 et seq. and the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.  An actual, justiciable controversy now exists between Plaintiff and Defendants, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 16 U.S.C. § 1540(g).

9.      Venue is properly vested in this Court under 16 U.S.C. § 1540(g)(3)(A) because the violations occurred in this judicial district.

10.     As required by the ESA, Western Watersheds Project provided sixty days' notice of its intent to bring this action.

11.     The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g)(1).

**PARTIES**

12.      Plaintiff WESTERN WATERSHEDS PROJECT is a regional, membership, not-for-profit conservation organization, dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West.  WWP is headquartered at the Greenfire Preserve in Custer County, Idaho, and also has staff or offices in Salmon, Hailey, Boise, and McCall, as well as in other western states.  Through agency proceedings, public education, scientific studies, and legal advocacy conducted by its staff, members, volunteers, and supporters, WWP is actively engaged in protecting and improving riparian areas, water quality, fisheries, wildlife habitat, and other natural resources and ecological values of western watersheds, including within the Upper Salmon River Watershed area.

13.     Western Watersheds Project has participated in decision-making processes for

livestock grazing on BLM and Forest Service lands throughout the west, including the subwatersheds at issue here.  WWP staff, members, and supporters use and enjoy the fish and wildlife, public lands, and natural resources on federal lands in the Upper Salmon River Watershed for many health, recreational, scientific, spiritual, educational, aesthetic, and other purposes.  WWP staff, members, and supporters pursue activities such as hiking, fishing, hunting, photography, scientific study, wildlife viewing, and spiritual renewal on BLM and Forest Service lands in the Upper Salmon River Watershed.  Livestock grazing, water diversions, and other activities that degrade these lands, waters, fish, and other natural resources impair the use and enjoyment of these lands by WWP staff, members, and supporters.

14.     WWP staff, members, and supporters plan to continue to visit and use these public lands in the Upper Salmon River Watershed in the near future.  WWP's interests, both organizationally and on behalf of its staff, members, and supporters, in the preservation and protection of this area and its resources are being directly harmed by Defendants' actions challenged herein.  WWP staff, members, and supporters' above-described aesthetic, conservation, recreational, scientific, and other interests have been, are being, and unless the relief prayed for is granted, will continue to be adversely affected and irreparably injured by Defendants' violations of law.  WWP has no adequate remedy at law, and thus the requested relief is appropriate.

15.     Defendant DAVID ROSENKRANCE is an employee of the BLM, who currently serves as Field Office Manager for the BLM's Challis Field Office, based in Challis, Idaho.  As the Challis Field Office Manager, Defendant Rosenkrance has management and supervisory authority over livestock grazing authorizations as well as other activities on lands managed by the BLM's Challis Field Office, including in the Upper Salmon River Watershed; and is

responsible for ensuring that those activities comply with all federal laws and regulations, including the ESA. Defendant Rosenkrance is sued solely in his official capacity.

16.     Defendant BUREAU OF LAND MANAGEMENT is an agency or instrumentality of the United States, and is charged with managing the public lands and resources of the Challis Field Office, in accordance and compliance with federal laws and regulations.

17.     Defendant FRANK GUZMAN is an employee of the U.S. Forest Service, who currently serves as Supervisor for the Salmon-Challis National Forest, based in Salmon, Idaho. As Forest Supervisor, Defendant Guzman has management and supervisory authority over livestock grazing and water diversion authorizations as well as other activities on the Salmon-Challis National Forest, including in the Upper Salmon River Watershed; and is responsible for ensuring that those activities comply with all federal laws and regulations, including the ESA. Defendant Guzman is sued solely in his official capacity.

18.     Defendant U.S. FOREST SERVICE is an agency or instrumentality of the United States, and is charged with managing the public lands and resources of the Salmon-Challis National Forest, in accordance and compliance with federal laws and regulations.

19.     Defendant GARY BURTON is an employee of the U.S. Fish and Wildlife Service, who currently serves as Field Supervisor of the Snake River Field Office, based in Boise, Idaho. As the Snake River Field Office Supervisor, Defendant Burton is responsible for administering the provisions of the ESA for the Snake River region, which encompasses the BLM Challis Field Office and the Salmon-Challis National Forest. Defendant Burton is sued solely in his official capacity.

20.     Defendant U.S. FISH AND WILDLIFE SERVICE is an agency or instrumentality

of the United States, and is responsible for administering the provisions of the ESA with regard

to threatened and endangered terrestrial and freshwater aquatic species, including threatened

Columbia River bull trout.

21.     Defendant DAVID MABE is an employee of NOAA Fisheries, who currently

serves as Supervisor of the Idaho State Habitat Office, based in Boise, Idaho.  As the Idaho

Habitat Office Supervisor, Defendant Mabe is responsible for administering the provisions of the

ESA for the State of Idaho, which encompasses the BLM Challis Field Office and the Salmon-

Challis National Forest.  Defendant Mabe is sued solely in his official capacity.

22.     Defendant NOAA FISHERIES is an agency or instrumentality of the United

States, and is responsible for administering the provisions of the ESA with regard to threatened

and endangered marine species, including Snake River Chinook salmon, Snake River sockeye

salmon, and Snake River steelhead.

## ENDANGERED SPECIES ACT

23.     Under the ESA, Fish and Wildlife Service or NOAA Fisheries must list a species

as endangered if it is in danger of going extinct throughout all or a significant portion of its

range, and must list it as threatened if it is likely to become endangered in the foreseeable future.

16 U.S.C. §§ 1532(6),(20); 1533(a)(1).[2]  The Services may also list sub-species or distinct

populations of fish or wildlife as threatened or endangered under the ESA.  *Id.* § 1532(16).

24.     Once species are listed as threatened or endangered, the Services must designate

their critical habitat, which is occupied or unoccupied habitat that contains physical or biological

features essential to the conservation of the species and which may require special management

---

[2] U.S. Fish and Wildlife Service is responsible for consultations involving freshwater aquatic
species, such as bull trout, while NOAA Fisheries is responsible for consultations involving
marine species, such as salmon and steelhead.

considerations or protection.  *Id.* §§ 1532(5); 1533(a)(3).  The intent of the ESA is to conserve ecosystems upon which threatened and endangered species depend, and recover listed species to the point at which they no longer need the protections of the Act.  *Id.* §§ 1531(b); 1532(3).

25.     A federal agency that authorizes an activity that may affect a listed species or critical habitat must consult with the Services over the impacts of that activity to ensure that it does not jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(a)(2).  Jeopardize means to reduce appreciably the likelihood of both the survival and recovery of the species in the wild by reducing the reproduction, numbers, or distribution of the species.  50 C.F.R. § 402.02.   Destruction or adverse modification is a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species.  *Id.*

26.     During the ESA consultation process, if the action agency concludes in a "biological assessment" that the activity is "not likely to adversely affect" the listed species or adversely modify its critical habitat, and the Service concurs with that conclusion, then the consultation is complete.  *Id.* §§ 402.12, 402.14(b).  If, however, the action agency or the Service determines that the activity is "likely to adversely affect" the listed species or its critical habitat, then the Service completes a "biological opinion" to determine whether the activity will jeopardize the species or result in destruction or adverse modification of critical habitat.  *Id.* § 402.14.  If the Service determines that the action will jeopardize the species or adversely modify critical habitat, it may propose one or more reasonable and prudent alternative actions that would avoid such results.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5).

27.     In addition to the substantive duty under ESA Section 7(a)(2) to avoid jeopardizing a species or adversely modifying critical habitat, the action agencies also have a

duty, while the consultation process is occurring, to avoid making any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures that would avoid jeopardizing the species or adversely modifying critical habitat. 16 U.S.C. § 1536(d).

28.     The ESA and its regulations also prohibit "take" of listed species, where take includes harassing, harming, wounding, or killing the species.  16 U.S.C. §§ 1538; 1533(d); 1532(19).  Harm is further defined to include significant habitat modification or degradation that injures a listed species by significantly impairing its breeding, feeding, or sheltering behaviors, while harassment is an act that creates the likelihood of injury by annoying a species to the extent that it significantly disrupts breeding, feeding, or sheltering behaviors.  50 C.F.R. § 17.3.

29.     The Services, however, can authorize take of a listed species through an "Incidental Take Statement" that accompanies a biological opinion if the taking is incidental to an otherwise lawful activity and does not cause jeopardy to the species or adverse modification of critical habitat.   16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).  Any taking that conforms to the terms and conditions within an Incidental Take Statement is not prohibited under Section 9 of the ESA.  16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

30.     Once the consultation is complete, the agencies have a duty to insure that it remains valid.  Reinitiation of consultation is required and shall be requested by the action agency or the Services if: (a) the amount or extent of taking specified in the incidental take statement is exceeded; (b) new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered: (c) the identified action is subsequently modified in a manner that causes an effect to the listed species or critical

habitat that was not considered in the biological opinion; or (d) a new species is listed or critical

habitat designated that may be affected by the identified action.  50 C.F.R. § 402.16.

## STATEMENT OF FACTS

**I.      Overview of Upper Salmon River Watershed**

31.      The Upper Salmon River Watershed contains 314,500 acres of land within the

rugged Salmon River Mountains of central Idaho.  As noted above, the Upper Salmon River

Watershed is not a true watershed, but was contrived for purposes of ESA consultations.  It

consists of the Salmon River between its confluence with the Pahsimeroi River and its

confluence with the East Fork Salmon River, and five subwatersheds that drain into this portion

of the Salmon River:  Morgan Creek, Challis Creek, Garden Creek, Bayhorse Creek, and Warm

Springs Creek.

32.      Most of the land in the Upper Salmon River Watershed is owned by the federal

government, with BLM managing 33% and the Forest Service managing 55% of the area.  A

small portion of State land exists here and the remainder is private land.  Most of the private land

occurs along the valley bottoms, with BLM land above this, and Forest Service land at the

highest elevations.

33.      Various activities occur on BLM and Forest Service land, including recreation,

mining, and timber sales, but the predominant activity by far is livestock grazing.  The private

land is used primarily for agricultural pastures to feed livestock that graze the federal land in

summer, and numerous water diversions in all of the subwatersheds remove water from streams

to irrigate these pastures.  These diversions significantly reduce streamflows between late April

and October, and many tributaries only reach the larger rivers during spring runoff.

34.      The Warm Springs subwatershed is influenced by geothermal processes and

water temperatures exceed 20°C throughout the subwatershed.  Therefore, salmon, steelhead, and bull trout do not inhabit this subwatershed.  However, activities in the Warm Springs subwatershed that contribute pollutants or sediment to the streams affect habitat and fish populations downstream in the main Salmon River.

35.     The Morgan Creek subwatershed encompasses 77,305 acres covered primarily by sagebrush/grass communities.  Morgan Creek flows into the Salmon River about 10 miles north of Challis.  Habitat for salmon, steelhead and bull trout occurs in this subwatershed.  Morgan Creek and numerous perennial tributaries have water diversions on them that reduce stream flows significantly from March to November, impede fish passage, and entrain fish in ditches. The Morgan Creek grazing allotment covers the entire Morgan Creek subwatershed, and also extends into the adjacent Camas Creek subwatershed to the west and Panther Creek subwatershed to the north.

36.     The Challis Creek subwatershed is 129,280 acres in size, and Challis Creek enters the Salmon River about four miles north of Challis.  Tributaries to Challis Creek include Darling Creek, Eddy Creek, and Mill Creek.  Although Garden Creek drains directly into the Salmon River, it was included within the Challis Creek subwatershed for the Upper Salmon River Watershed consultations at issue here because of its close proximity to Challis Creek.  There are no perennial tributaries to Garden Creek.  Both subwatersheds contain habitat for the three listed fish species.

37.     All of the perennial streams within the Challis Creek and Garden Creek subwatersheds have water diversions on them for irrigation, and a dam on the upper part of Challis Creek creates Mosquito Flat Reservoir, which is also used to irrigate pastures for livestock feed.  These diversions significantly dewater the streams and disrupt or completely

eliminate fish migration to and from the Salmon River.  Two grazing allotments occur in the

Challis Creek subwatershed:  the Challis Creek allotment and the Eddy Creek allotment.  The

Garden Creek allotment is the only grazing allotment within the Garden Creek subwatershed.

38.     Finally, the Bayhorse Creek subwatershed drains into the Salmon River upstream

of the other subwatersheds, roughly ten miles south of Challis.  This subwatershed covers 41,607

acres and Bayhorse Creek is the only perennial stream.  Water diversions on Bayhorse Creek

fully dewater the creek in summer.  The primary road in the subwatershed, which runs along

Bayhorse Creek, contains mine tailings contaminated with heavy metals.  One grazing allotment,

the Bayhorse allotment, occurs within this subwatershed.

**II.     ESA Listed Fish in the Upper Salmon River Watershed**

39.     The Services have listed numerous populations of salmon, steelhead, and bull

trout as threatened or endangered under the ESA because of significantly declining populations,

which often result from habitat destruction and degradation.  These fish require clean, cold water

to survive and reproduce.  Water that has elevated levels of sediment, temperatures, or other

pollutants impairs the survival of the fish by hindering their biological functions, and also

impairs reproduction by covering spawning gravels where the fish lay eggs with sediment that

suffocates the eggs and young fry that emerge.  The fish also require cover in the form of

undercut banks and overhanging vegetation, large woody debris, and deep pools that allow them

to hide from predators and rest outside of the current.

40.     Salmon and steelhead are anadromous species, meaning they are born in inland

streams, migrate out to the ocean as juveniles, and then return to their natal streams several years

later as adult fish to spawn.  Bull trout are not anadromous and do not migrate to the ocean.

Some bull trout, however, migrate from smaller streams to larger rivers or lakes to overwinter

before returning to the smaller streams to spawn, while others remain within individual streams.

41.    The subwatersheds within the Upper Salmon River Watershed area provide habitat for three species of threatened fish:  Snake River spring/summer Chinook salmon, Snake River steelhead, and Columbia River bull trout.  In addition, endangered Snake River sockeye salmon migrate past the mouth of these creeks in the Salmon River on their way between their spawning grounds in headwater lakes of the Salmon River and the ocean.

42.    Snake River spring/summer Chinook salmon was listed as threatened in 1992. Historically, streams in the Upper Salmon River Watershed provided habitat for Chinook salmon, but dewatering from irrigation diversions and other activities have created many barriers to upstream movement of these fish and reduced habitat significantly. Now, Chinook use only the lower reaches of Morgan Creek, Challis Creek, Garden Creek, and Bayhorse Creek for spawning or rearing.  However, because of their importance to the recovery of the species, many miles of unoccupied streams within this area are listed as critical habitat for Chinook salmon.

43.    Snake River spring/summer Chinook salmon spawn in this portion of the Salmon River basin from mid-August through September, and fry emerge from February through June. A 2005 status review for the species concluded that it was still below abundance levels necessary for recovery and remained at risk of becoming endangered in the foreseeable future.  The 2006 draft recovery plan listed the population of Chinook salmon in this area as at high risk for population abundance and productivity because of its low numbers and thus did not consider it a viable population.

44.    Snake River steelhead was listed as threatened in 1997 and is also currently found in the Upper Salmon River Watershed but with a vastly reduced range compared to its historic distribution.  Currently it is known to spawn only in lower stretches of Morgan Creek, Challis

Creek, Garden Creek, and Bayhorse Creek.  Steelhead critical habitat was designated in 2005

and includes the Salmon River as well as many of its tributaries in the Upper Salmon River

Watershed, such as Morgan Creek, West Fork Morgan Creek, Van Horn Creek, Lick Creek,

Corral Creek, Blowfly Creek, Challis Creek, Darling Creek, Garden Creek, and Bayhorse Creek.

45.     Steelhead migrate to this area in fall, overwinter here, and spawn from mid-March

to mid-June, with fry emerging from June through October.  Wild steelhead populations are

significantly depressed compared to historic levels and a 2006 status review concluded that the

species remains at risk of becoming endangered in the foreseeable future, with population

abundance well below recovery targets.

46.     Columbia River bull trout was listed as threatened in 1998.  Bull trout are still

found within each of the subwatersheds in the Upper Salmon River Watershed but at

significantly reduced numbers.  Some populations are fluvial, meaning they migrate between

smaller streams and larger rivers, while others remain within individual streams.  Many bull trout

are cut off from the main Salmon River due to water diversions that obstruct and/or dewater the

streams, eliminating migration paths that used to occur.  No critical habitat for bull trout was

designated in the Upper Salmon River Watershed in the final bull trout critical habitat rule, but

Fish and Wildlife Service is currently redoing its bull trout critical habitat designation due to

political interference with the final rule (the proposed rule had designated significantly more

critical habitat, the majority of which was removed in the final rule).

47.     Bull trout require colder water than salmon or steelhead, rarely occurring in water

above 59-64°F.  These fish spawn from mid-August through October and fry emerge in the

spring.  The 2008 status review for this species determined that it warranted a continued listing

as threatened due to continuing depressed populations.

48.     Snake River sockeye salmon was listed as an endangered species under the ESA in 1991, and its critical habitat was designated in 1993.  The entire Salmon River is critical habitat for sockeye and the species migrates past the mouth of Morgan Creek, Challis Creek, Garden Creek, and Bayhorse Creek.  Adults migrate upstream to their spawning grounds in May to August, and young smolts migrate to the ocean from March to June.  Therefore, activities in the Upper Salmon River Watershed, which includes a stretch of the main Salmon River, can impact habitat of sockeye salmon as well.

## II.     PACFISH and INFISH

49.     Beginning in the mid-1990's, BLM and the Forest Service developed strategies designed to protect salmon, steelhead, and bull trout habitat on federal land when it became clear that these species had substantially declined across their ranges and significant changes to habitat management were necessary.  PACFISH was a strategy aimed to protect salmon and steelhead habitat on federal land in Eastern Oregon and Washington, Idaho, and portions of California, while INFISH was adopted to protect native resident fish like bull trout in those same areas.

50.     These strategies applied to all BLM and Forest Service lands in the areas they covered.  These agencies modified their land management plans with PACFISH and INFISH direction.  The Forest Service formally amended their land and resource management plans with the strategies, while BLM applied the strategies to their land management plans through agency instructional memoranda.

51.     PACFISH and INFISH were intended to be interim strategies until the agencies could develop long-term habitat protection plans that were incorporated into revised land management plans.  However, few forests or BLM districts have completed land management plan revisions, and thus many still must comply with PACFISH and INFISH, including the

Salmon-Challis National Forest.  The BLM's Challis Field Office revised its resource management plan in 1999, and adopted many of the standards from PACFISH and INFISH in its plan.

52.     PACFISH contains numerous provisions to protect and restore salmon and steelhead habitat, including:  (a) setting riparian management goals; (b) establishing riparian management objectives (RMOs), which are quantitative targets for important fish habitat components of water temperature, pool frequency, large woody debris, bank stability, lower bank angle, and width to depth ratio; (c) requiring delineation of riparian habitat conservation areas (RHCAs); (d) setting standards and guidelines for activities occurring within RHCAs, such as grazing, mining, timber harvest, roads, and fire management; (e) designating key watersheds; (f) encouraging watershed analyses and watershed restoration projects; and (g) requiring monitoring for implementation of standards and guidelines and their effectiveness at meeting RMOs.

53.     The PACFISH standards that apply to livestock grazing require BLM and the Forest Service to modify grazing practices that retard or prevent attainment of RMOs or are likely to adversely affect anadromous fish, and to suspend grazing if modifications are not effective in meeting RMOs or avoiding adverse effects to the fish.  The standards also limit livestock trailing, bedding, and watering to those areas and times that would not retard or prevent attainment of RMOs or adversely affect anadromous fish.

54.     INFISH contains almost identical provisions to PACFISH, including the same grazing standards.  It also includes the same RMOs except that the target for water temperature is slightly lower in INFISH due to bull trout needing colder water.

55.     BLM and the Forest Service consulted with the Services over the implementation of PACFISH and INFISH direction, resulting in several biological opinions.  The earliest

opinions from NOAA Fisheries considered the short-term use of PACFISH and its impacts on listed salmon species.  A subsequent opinion in 1998, however, assessed the long-term use of PACFISH within existing land management plans and its impacts on salmon and steelhead once steelhead were listed and it became apparent that revision of most plans was not imminent.

56.     The PACFISH biological opinions contained additional requirements beyond those in PACFISH itself.  These requirements included adding sediment as an RMO and increasing the streambank stability RMO to 90%; annually conducting implementation, effectiveness, validation, and photopoint monitoring to assess compliance with RMOs and continuing impacts to listed fish; developing stream restoration plans and projects; conducting subbasin or watershed analyses; and conducting programmatic biannual reviews of projects to update the environmental baseline conditions in the watershed and assess impacts of new events and activities on a watershed basis.

57.     A separate 1998 biological opinion by Fish and Wildlife Service considered the impacts to bull trout from long-term use of INFISH and PACFISH in land management plans. Like the 1998 NOAA Fisheries biological opinion, this opinion incorporated additional requirements beyond those in INFISH and PACFISH, including commitments for watershed analyses and restoration projects that emphasize recovery of bull trout, improved monitoring that is commensurate with on-the-ground activities, and developing grazing plans in areas of known or suspected spawning to minimize trampling of redds (nests) and other forms of take of bull trout.  It also required completion of consultation over federal projects at a watershed scale to facilitate evaluation of individual and cumulative effects of projects and accurately assess the impacts to bull trout populations, and updating the environmental baseline at the watershed scale to include proposed actions once the original consultation was concluded.

58.     These 1998 biological opinions, referred to as the "LRMP biops," still apply to lands within the BLM Challis Field Office and Salmon-Challis National Forest at issue here.

III.    **ESA Consultation History For The Upper Salmon River Watershed**

59.     Authorization of livestock grazing on federal land is a federal action that requires ESA consultation because it poses significant adverse effects to listed fish.  Livestock prefer grazing in riparian areas because of the water, shade, and rich vegetation present there.  This use can cause overgrazing of riparian vegetation as well as trampling and shearing of streambanks, which in turn reduces stream shading, increases sediment input into streams, and alters the floodplain and stream channel.  These effects lead to warmer waters with higher levels of sediment and fewer protected areas for fish in the form of undercut banks and deep pools. Warmer water temperatures and sediment affect not only the streams in the immediate vicinity of the livestock but also downstream fish habitat.

60.     Livestock also walk in the streams, trampling spawning gravels and destroying redds of salmon, steelhead, or bull trout, as well as contributing further sedimentation and pollution with their excretions.

61.     Grazing in the uplands affects fish habitat too.  Livestock trample soils and destroy biological soil crusts, causing soil erosion that leads to more overland transport of sediment that is deposited in streams and degrades fish habitat.  Cattle also compact soil, which reduces water infiltration and lowers the water table.

62.     In order to remove cattle away from riparian areas, the agencies often "develop" upland seeps and springs by piping water from these wetland areas into troughs for cattle to drink.  But such water developments remove water from these natural sources, altering the hydrology of the watershed and reducing groundwater that contributes to streamflows later in the

summer.  Agencies also construct fences to try to exclude livestock from riparian areas, but livestock frequently trespass into such exclosures; and fencing fragments habitat for wildlife and poses risk of injury to wildlife.

### A.    Salmon and Steelhead Consultations

63.    In 1994-1995, the agencies consulted over impacts to Chinook and sockeye salmon from ongoing activities in numerous watersheds within the Salmon River basin, including the subwatersheds at issue here.  They also conducted several short-term site-specific consultations over impacts to salmon just from the Morgan Creek grazing allotment in the late 1990's.

64.    In 2000, BLM and the Forest Service submitted to NOAA Fisheries a joint biological assessment for the area designated as the Upper Salmon River Watershed that "evaluated all ongoing activities for their potential to affect" Snake River steelhead or their habitat.  This assessment covered various activities that the agencies determined "may affect" the listed steelhead.

65.    Specifically, the steelhead biological assessment analyzed five grazing allotments that were jointly managed by the Forest Service and BLM:  Morgan Creek allotment, Challis Creek allotment, Eddy Creek allotment, Garden Creek allotment, and Bayhorse allotment.  In addition, the assessment analyzed various recreation sites and uses as well as several easements, rights-of-way, and special use permits for both Forest Service and BLM land.

66.    For the grazing allotments analyzed, the joint biological assessment included a description of the grazing that occurred on the allotments, the monitoring the agencies conducted to determine whether grazing was degrading riparian areas or uplands, and the standards that applied to evaluate ecological conditions.

67.     For instance, the assessment stated the number of livestock, season of use, and management systems used on the five allotments as well as applicable grazing utilization standards.  The assessment also described the Forest Service's monitoring protocols by noting the various types of monitoring done, including forage utilization, streambank stability, riparian vegetation and woody shrub conditions, water temperature, and fish habitat.  The assessment similarly listed the types of variables BLM monitored.  And it discussed the different standards for water temperature, sediment, fish habitat elements, stream channel conditions, and other parameters used to indicate ecological conditions.

68.     The discussion about the Morgan Creek allotment was particularly detailed as that allotment was managed under a high-intensity, short-duration grazing system where three pastures were each divided into ten paddocks with each paddock grazed for four to ten days. Movement between paddocks was triggered by plant phenology, 4" stubble height, bank disturbance, or site specific sensitivity.  At least one and usually two herders were with the herd seven days a week to ensure that livestock were intensively managed and moved together as a cohesive herd to avoid sensitive stream segments and unacceptable levels of impact.  And fence maintenance had to be completed on paddocks prior to the livestock's arrival.

69.     The assessment also listed the type and frequency of monitoring conducted specifically on the Morgan Creek allotment, and noted problems with heavy grazing impacts such as raw streambanks in an area on the allotment called "the slot."

70.     BLM and the Forest Service concluded in the biological assessment that the activities in the Upper Salmon River Watershed were not likely to adversely affect steelhead. Despite acknowledging that grazing impacts steelhead, the action agencies determined that these impacts were not likely to degrade habitat in the long-term and that best management practices

and mitigation measures would reduce any measurable effects on the species and its habitat.  The mitigation measures discussed in the biological assessment were livestock use standards and changes in grazing management based on monitoring conducted to determine conditions and trends of riparian areas and whether livestock were having adverse effects to fish habitat.

71.     NOAA Fisheries concurred with the assessment's conclusion in March 2000.  It stated that based on the best available information and successful implementation of mitigation measures described in the biological assessment, as well as its previous consultation over impacts to salmon, the activities would have no more than a negligible potential to adversely affect Snake River salmon and steelhead or their critical habitat.  The concurrence letter also stated that the activities conformed with direction in land management plans as well as PACFISH.

72.     NOAA Fisheries' letter of concurrence contained an expiration date for the consultation of January 15, 2003.  It also explained that the action agencies must reinitiate consultation if new information became available or if circumstances occurred that may affect listed species or their critical habitat in a manner or to an extent not previously considered.

73.     Despite the January 15, 2003 expiration date for the salmon and steelhead consultation, the agencies never reinitiated or updated the Upper Salmon River Watershed consultation.  Instead, under pressure from the action agencies, NOAA Fisheries simply eliminated the expiration date altogether and thus the 2000 Upper Salmon River Watershed consultation has never been updated.

**B.     Bull Trout Consultations**

74.     In 1999, BLM and the Forest Service submitted a joint biological assessment to Fish and Wildlife Service that "evaluated all ongoing activities for their potential to affect bull

trout or their habitat" in the Upper Salmon River Watershed.  This assessment was almost identical to the steelhead assessment, and also concluded that these activities were not likely to adversely affect bull trout for the same reasons.  At the time the assessment was written only a few of the streams that are currently known to be inhabited by bull trout were listed as having bull trout present.

75.     The bull trout assessment analyzed similar activities as the steelhead assessment: the Morgan Creek, Challis Creek, Eddy Creek, Garden Creek, and Bayhorse grazing allotments as well as numerous recreation sites such as campgrounds, boat access sites, and trails.  This assessment noted that it was excluding activities that were to be addressed in separate programmatic consultations such as road and trail maintenance, dispersed recreation, travel plan management, fire suppression, firewood cutting, weed treatment, and monitoring.

76.     In March 2000, Fish and Wildlife Service concurred with the "not likely to adversely affect" conclusion in the biological assessment for most of the activities addressed in the bull trout biological assessment after considering information in the assessment as well as in PACFISH, INFISH and the LRMP biops.  The Service determined that based on the information in the biological assessment, field reviews, discussions with the agencies, and agreements about additional mitigation measures, all but one activity was not likely to adversely affect bull trout. Only the Mosquito Flat Dam was not included in the letter of concurrence because that project was not completely analyzed in the biological assessment.

77.     At the same time the agencies were consulting over the Upper Salmon River Watershed, they were also consulting over the adjacent Panther Creek Watershed, which is just to the north of the Morgan Creek subwatershed.  The consultation encompassed not only the activities in the Panther Creek watershed but also the whole Morgan Creek allotment, which fell

within the Panther Creek watershed as well as the Upper Salmon River Watershed and the Camas Creek watershed.

78.     In September 2000, Fish and Wildlife Service issued a combined letter of concurrence and biological opinion for the Panther Creek watershed.  It concurred with the action agencies that two grazing allotments and two campgrounds were not likely to adversely affect bull trout, but that four grazing allotments, including the Morgan Creek allotment, were likely to adversely affect the species.  The biological opinion stated that it amended the previous determination in the Upper Salmon River Watershed consultation that the Morgan Creek allotment was not likely to adversely affect bull trout.

79.     The Panther Creek biological opinion listed objectives and guidelines for each of the four allotments covered, including that cattle would be removed in a timely manner to ensure utilization standards are not exceeded; cattle would be removed from areas with bull trout prior to bull trout spawning; and that PACFISH and INFISH standards and guidelines apply.  It also noted important monitoring and standards to use to assess whether goals and objectives for riparian areas are being met, such as monitoring for stubble height standards, woody species use, bank trampling, and overuse of sensitive areas or plants.  The opinion concluded that the grazing on each of the allotments was not likely to jeopardize the continued existence of bull trout as long as grazing met prescribed stubble height standards and did not impair sensitive areas, more frequent range riding occurred, monitoring was conducted, and management changes occurred to meet objectives based on monitoring results.

80.     The Panther Creek biological opinion also included an Incidental Take Statement, which stated that grazing in riparian areas of each of the four allotments was likely to result in incidental take of bull trout due to detrimental effects to water temperature, substrate quality,

bank stability, food supply, spawning success, and sediment levels.  The level of authorized take would be exceeded if proper use standards and objectives from resource management plans or the PACFISH/INFISH standards and guidelines were exceeded.

81.    The reasonable and prudent measures listed in the Incidental Take Statement necessary to minimize the impacts of incidental take were to minimize adverse impacts of grazing activities to aquatic and riparian habitats; implement actions that contribute to or provide for essential components necessary for the conservation of bull trout and their habitat; and revise allotment management plans to reflect the new grazing strategy.

82.    The Incidental Take Statement also listed mandatory terms and conditions with which the agencies must comply or insert as binding conditions of any grazing permit to implement the reasonable and prudent measures.  They included:

- revise the allotment management plans to incorporate measures from the biological assessment and biological opinion;

- ensure requirements and objectives from the biological opinion are successfully met;

- establish photo points to monitor streambank condition and provide photos in end-of-year monitoring report;

- monitor key representative areas within each pasture for use requirements to ensure terms and condition of the biological opinion are met by monitoring pastures approximately every two weeks during the grazing season and at the end of the growing season, and submit results annually to the Service;

- ensure that cattle do not congregate in riparian areas or other sensitive areas, and wherever observed, cattle should be dispersed away from riparian areas;

- review all occupied or connected streams and wetlands each year to determine problem

areas and assign mitigation measures to reduce impacts; and

- ensure trailing occurs outside of riparian areas and wet meadows to the extent possible.

83.    The opinion noted that new grazing plans should initiate recovery of upland and riparian areas that have been degraded through decades of intense grazing pressure.  It explained that maintaining plant vigor, providing cover and shade to reduce stream temperatures, protecting streambanks from trampling, and reducing sediment runoff to local and downstream waters will aid in the conservation and recovery of bull trout.

84.    Finally, the opinion stated that reinitiation of formal consultation must occur if the amount or extent of incidental take is exceeded, new information reveals effects of the agency actions that may affect bull trout in a manner or to an extent not considered in the opinion, agency actions are modified in a manner that causes an effect to bull trout that was not considered in the opinion, or the agencies cannot meet the general and site specific resource objectives described in the reasonable and prudent measures and terms and conditions of the biological opinion.  In instances where the amount or extent of incidental take is exceeded, any operation causing such take must cease pending reinitiation.

85.    Subsequent to the September 2000 Panther Creek biological opinion, in April 2001 BLM and the Forest Service complained to Fish and Wildlife Service about the biological opinion's imposition of more stringent requirements on the entire Morgan Creek allotment for areas of the allotment outside of the Panther Creek watershed.  They argued that the Upper Salmon River Watershed analysis, with its "not likely to adversely affect" conclusion, should govern management of the portion of the Morgan Creek allotment within the Morgan Creek subwatershed, and they should not have to comply with the terms of the Panther Creek watershed consultation across the entire Morgan Creek allotment.

86.     The Service replied in May 2001 that because the operation of the allotment is interconnected between three watersheds, it had to review the effects of the entire allotment within those watersheds.  Thus, it explained that it withdrew its previous conclusion from the Upper Salmon River Watershed consultation and found that continued management of the Morgan Creek allotment in its entirety would result in adverse impacts to the bull trout.  The Service acknowledged that many of the adverse impacts would be focused in the Panther Creek watershed and thus the reasonable and prudent measures were focused in that watershed as well.  However, it did not rescind its finding that continued grazing of the entire allotment would have adverse impacts on bull trout.

87.     A follow-up letter from the Service in May 2002 reiterated this position, explaining that the analysis must include effects of interrelated and interdependent actions and thus the scope of consultation for the Panther Creek watershed properly included the entire Morgan Creek allotment within the Morgan Creek, Camas Creek, and Panther Creek watersheds.

88.     However, in June 2002, in a verbal discussion between the Forest Service and Fish and Wildlife Service, the agencies agreed that the terms and conditions from the Panther Creek watershed biological opinion would apply only to the Panther Creek watershed portion of the Morgan Creek allotment.  This agreement was never documented in writing to formally amend the Panther Creek watershed biological opinion.  Thus, the portion of the Morgan Creek allotment within the Morgan Creek subwatershed has been continuously managed pursuant to the less stringent March 2000 Upper Salmon River Watershed consultation despite the clear written direction in the 2000 Panther Creek biological opinion that its more stringent requirements applied to the entire Morgan Creek allotment.

89.     In 2007, the agencies conducted a new consultation for the Panther Creek

watershed, but that consultation addressed impacts to bull trout from just the Panther Creek portion of the Morgan Creek allotment rather than the whole allotment. Likewise, in 2006 the agencies conducted a new consultation for the Camas Creek watershed which likewise addressed impacts to bull trout just from the Camas Creek portion of the Morgan Creek allotment.

90.     The Upper Salmon River Watershed consultation has never been updated and therefore the agencies have never reassessed this area as a whole or the Morgan Creek subwatershed since the 1999/2000 consultations.

### C.     Water Diversions Consultation

91.     In addition to the consultations over ongoing activities on federal land in the Upper Salmon River Watershed described above, the Forest Service is also consulting with the Services over water diversions on its land in the watershed. The subwatersheds within the Upper Salmon River Watershed area contain numerous water diversions on private and federal land, most of which are used to irrigate agricultural land. These diversions impact fish by removing water from streams and diverting it to private land through ditches, thereby reducing streams flows and often completely dewatering the stream before it reaches the Salmon River. The diversions can also block instream fish passage or direct fish into ditches, which are inhospitable as habitat.

92.     The water diversions consultation stems from the *WWP v. Matejko* lawsuit brought by Western Watersheds Project in 2001, which, as noted above, resulted in a settlement agreement whereby the Forest Service agreed to initiate ESA consultation with the Services over impacts of water diversions across the Salmon-Challis National Forest to salmon, steelhead, and bull trout. The parties agreed that the Forest Service would submit separate biological assessments on a watershed basis over the course of six years.

93.     Originally, the Forest Service contemplated including water diversions and other ongoing activities such as livestock grazing in comprehensive biological assessments for each watershed on the forest.  Later, the agency changed course and decided to issue separate biological assessments that covered only the water diversions.

94.     The Forest Service submitted a biological assessment to the Services in June 2004 that covered water diversions on forest land in the Upper Salmon River Watershed.  This assessment concluded that many of the diversions were likely to adversely affect threatened steelhead and bull trout and likely to adversely modify Chinook salmon critical habitat.

95.     More than five years later, neither Fish and Wildlife Service nor NOAA Fisheries has issued a biological opinion to complete the consultation process.  Yet the Forest Service continues to authorize use of water diversions and ditches on forest land that continue to reduce streamflows, impair fish passage, and entrain fish in ditches.

## IV.     Events Subsequent to these Consultations

96.     Since the 1999/2000 consultations over ongoing federal activities (other than water diversions) in the Upper Salmon River Watershed, circumstances have changed and new information has arisen that impact the listed fish here.

97.     In 2005, NOAA Fisheries designated critical habitat for Snake River steelhead, and a number of the streams within the Upper Salmon River Watershed area are listed as such. The agencies have never reinitiated consultation to assess the impacts of activities on the newly designated steelhead critical habitat.

98.     Over the last decade, multiple years of drought and several wildfires, including recent fires in the Morgan Creek and Challis Creek subwatersheds, have occurred in the area, which have impacted fish habitat and altered livestock grazing pressure.  Global warming is

becoming an increasing threat in the West, and new science on climate change shows that it is creating higher temperatures and drier conditions as well as altering the hydrology of watersheds and timing of peak streamflows, all of which impact fish.

99.     Furthermore, the agencies now have more information on bull trout presence and spawning in the Upper Salmon River Watershed, and know that bull trout inhabit more streams in these subwatersheds than what they assumed in the 1999 consultation.  Indeed, the agencies acknowledged that the original consultation did not adequately assess the potential for "take" of bull trout because of this lack of information.

100.     Numerous man-induced changes have also occurred in the area over the last ten years.  For instance, more water developments have been built, removing water from seeps and springs as well as streams and piping it to upland troughs, but the agencies have never comprehensively assessed the impact of all these developments on groundwater and surface water flows.

101.     Other changes in the watershed have occurred on private and federal land, such as changes to livestock grazing management; changes to water diversions and irrigation systems; prescribed fires; road and culvert work; increased use of streamside roads that contribute sediment and pollutants to the streams; increased off-road vehicle ("ORV") use as well as new ORV roads, trails, and stream crossings; stream channelization and bank armoring; logging projects; mining projects; increased use of herbicides on weeds; threats from whirling disease and aquatic exotic species; and stream restoration projects.

102.     As just one example, the biological assessment described a high-intensity, short-duration grazing system used on the Morgan Creek allotment where livestock grazed only four to ten days on each of 30 paddocks and were moved as one cohesive herd to better control use and

avoid overuse of any riparian or sensitive areas.  Yet after a few years, the agencies moved away from this system, returning to a system with far fewer units that has cattle spread across much wider areas over longer times with less intensive herding and control.

103.    All of these changes in the Upper Salmon River Watershed impact fish, whether in a positive or negative way, but the agencies have not updated their watershed consultations in the past ten years.  Thus, they have not considered these new circumstances and activities and reassessed the cumulative impacts of all ongoing activities to the listed fish that inhabit the Upper Salmon River Watershed, as required by the ESA and the PACFISH/INFISH LRMP biops.

104.    BLM and the Forest Service also have failed to comply with the substantive commitments they made in the 1999/2000 consultations, and thus the assumptions that Fish and Wildlife Service and NOAA Fisheries relied upon for their conclusions are no longer valid. Specifically, the agencies have failed to conduct the promised monitoring and meet the quantitative grazing standards.

105.    As noted, the Upper Salmon River Watershed biological assessments listed the different types of monitoring each agency supposedly conducted to assess riparian conditions and impacts to fish habitat.  BLM monitoring consisted of upland forage utilization using the height-weight stubble height method, monitoring of key riparian areas both on the greenline and the adjacent floodplain for plant community composition and stubble height, riparian shrub use, proper functioning condition assessments, photopoints, water temperature, aquatic habitat data, and runoff event monitoring.

106.    For the Forest Service, it included forage utilization (clipping and weighing vegetation from grazed and ungrazed areas), streambank stability both prior to and during the

grazing season, evaluation of plant seral states and community types along the greenline and riparian cross-sections, woody shrub regeneration, stream temperature, and aquatic habitat data using the Overton inventory protocol.

107.    The biological assessment listed even more specific monitoring to be conducted on the Morgan Creek allotment, including assessing bank stability once per year, bank disturbance twice per week in each active paddock, stream sediment once per year, water temperatures on a continuous basis during the summer, stubble height once or twice per week in each paddock as well as at the end of the season, proper functioning condition once per year, photographs every three years, compliance inspections repeatedly during the season, and ocular reconnaissance twice per week.

108.    PACFISH, INFISH, and the LRMP biops further required monitoring to determine if the agencies are implementing management actions that are supposed to prevent adverse effects to listed fish, whether those actions are effective at attaining the riparian management objectives for bank stability, lower bank angle, pool frequency, temperature, sediment, and width/depth ratios, and whether attainment of those objectives is improving fish habitat and fish populations.

109.    The agencies, however, have not performed this monitoring on a regular basis in the Upper Salmon River Watershed.  The only monitoring the agencies conduct somewhat regularly on an annual basis is stubble height.  Despite recognizing that other parameters such as bank trampling or bank stability and woody shrub use should be assessed each year and used as triggers to move livestock, the agencies do not consistently monitor those parameters.

110.    Other riparian monitoring, such as for plant cover, seral state, and composition on the greenline and the adjacent floodplain, has been conducted sparingly across the Upper Salmon

River Watershed.  Likewise, little monitoring for instream aquatic habitat conditions or PACFISH/INFISH riparian management objectives has occurred, with these subwatersheds having at most a few monitoring sites among the many streams with listed fish.

111.    The agencies have also failed to monitor population trends for the listed fish species, and thus cannot determine whether grazing is adversely affecting the fish or whether management changes have been effective at improving habitat and populations.

112.    Moreover, the limited monitoring that has been conducted shows grazing has violated standards, and that riparian conditions are not functioning appropriately.  Monitoring shows violations of stubble height and bank stability standards, poor riparian vegetation conditions, and streams that no longer function properly because they are too wide and shallow and are incised so no longer able to access the floodplain and maintain their natural sinuosity.

113.    For instance, on the Morgan Creek allotment, monitoring shows stubble height violations at numerous sites over the years, and even where stubble height standards were met, problems existed with bank trampling and sloughing, raw or unstable banks, channel downcutting, and lack of proper hydric riparian vegetation.  Hydric species are important because they have deeper root systems that stabilize the banks, filter overland sediment better, and promote better water infiltration in the floodplain compared to species found in uplands.

114.    Many of the streams on the Morgan Creek allotment are also heavily entrenched with little sinuosity and few undercut banks, and continuing grazing prevents these streams from recovering and reconnecting with their floodplains.  Just last year, a Forest Service report documented poor conditions at numerous sites along Morgan Creek with serious adverse impacts from livestock, including continued problems at "the slot," the same area documented ten years ago in the 1999 biological assessment as being degraded by livestock.

115.    The agencies are also ignoring other management requirements for the Morgan Creek allotment outlined in the consultations.  The 2000 Panther Creek biological opinion, which specifically stated that it covered the entire Morgan Creek allotment, required that cattle be removed prior to exceeding any utilization standards and removed from areas with bull trout prior to bull trout spawning, PACFISH and INFISH standards and guidelines apply, grazing does not impair sensitive areas, more frequent range riding occurs, and management changes occur to meet objectives based on monitoring results.  The mandatory terms and conditions included revising the allotment management plan to incorporate measures from the biological assessment and biological opinion, monitoring pastures for use requirements every two weeks during the grazing season and again at the end of the season and reporting results annually to Fish and Wildlife Service, ensuring that cattle do not congregate in riparian areas or other sensitive areas, and reviewing all occupied or connected streams and wetlands each year to determine problem areas and assigning mitigation measures to reduce impacts.  The agencies have not complied with these measures on the Morgan Creek allotment.

116.    Furthermore, even if the verbal agreement between the agencies in 2002 somehow eliminated the requirement to comply with the Panther Creek watershed biological opinion, the agencies still are not complying with the measures required for the Morgan Creek allotment in the Upper Salmon River Watershed consultation.  Cattle are no longer being closely herded in one cohesive group and restricted to short-duration use in small paddocks.  Instead, they are frequently spread across large areas in numerous groups, and are not all moved together to ensure that they are not impairing riparian or other sensitive areas.  And range improvements have not been constructed or maintained prior to grazing use, as required in the biological assessment.  These changes have led to frequent trespass of cattle into neighboring allotments,

cattle drifting back into areas already grazed, and other unauthorized use, often causing overuse and damage to riparian areas.

117.    As for monitoring of instream conditions and fish habitat, the small amount of data collected shows violations of one or more of the riparian management objectives from PACFISH and INFISH on several streams within the Upper Salmon River Watershed, and numerous other streams with listed fish have no data.  Of particular concern are the objectives for stream width/depth ratios and undercut banks, indicating that streams are too wide and shallow and have few undercut banks to offer protection for fish.  Other objectives with violations include bank stability, sediment levels, and water temperature.  The data also shows that in many instances, riparian areas do not have appropriate wetland species and are becoming dominated by upland species.

118.    By not complying with the monitoring and other requirements from the 1999/2000 consultations as well as land management plans and PACFISH, INFISH, and the LMRP biops, BLM and the Forest Service are not fulfilling their responsibilities as NOAA Fisheries and Fish and Wildlife Service assumed they would, and thus the Services' conclusions in these consultations concerning effects to the species are no longer valid, requiring reinitiation of consultation.

119.    Because of the changed circumstances, new information, and new steelhead critical habitat designated since the prior 1999/2000 consultations, the agencies must reinitiate consultation for salmon, steelhead, and bull trout over ongoing grazing authorizations and operation of recreation sites evaluated in the previous watershed consultations.  The Forest Service and BLM continue to authorize livestock grazing on the five allotments in the watershed through issuance or renewal of ten-year grazing permits and annual grazing authorizations, and

also continue to operate recreation sites and campgrounds.

120.    Specifically, the Forest Service and BLM continue to authorize grazing in the Upper Salmon River watershed via term grazing permits and annual grazing authorizations, and must reinitiate consultation over the impacts of these ongoing grazing authorizations to threatened salmon, steelhead, bull trout and/or designated critical habitat.   Any such new consultation(s) must assess grazing authorizations for the Morgan Creek, Challis Creek, Eddy Creek, Garden Creek, and Bayhorse grazing allotments.

121.    In addition, the Forest Service must reinitiate consultation over operation of the Mosquito Flat Reservoir Campground, Mill Creek campground, and Bayhorse Lake campground.  BLM must reinitiate consultation over operation of the Spring Gulch campground and Cottonwood Campground.

122.    BLM and the Forest Service continue to authorize grazing throughout the Upper Salmon River Watershed that allows cattle to access riparian areas, causing direct adverse impacts to streams that contain bull trout, steelhead, Chinook salmon or their critical habitat, and indirect adverse impacts to downstream habitat for the fish.  In many instances, this authorized grazing occurs during spawning periods, when the fish and their eggs are extremely vulnerable to the effects from grazing.

123.    The Forest Service also continues to authorize use of water diversions and ditches on forest land in the Upper Salmon River Watershed, diverting water into ditches and reducing streamflows on many streams that contain habitat for the listed fish or contribute flows to downstream habitat.

124.    By failing to reinitiate consultation for salmon, steelhead, and bull trout over the ongoing activities identified in paragraphs 120-121 for the entire Upper Salmon River

Watershed, as well as failing to complete the water diversions consultation for Forest Service lands in the watershed, Defendants have violated the consultation requirements of the ESA. Further, by continuing to authorize livestock grazing that adversely impacts listed fish species and their habitat, the agencies are violating their substantive duties under the ESA to prevent jeopardy, adverse modification of critical habitat, and take of these species and promote their recovery.  Plaintiff therefore requests declaratory and injunctive relief from this Court to remedy these violations of law.

**FIRST CLAIM FOR RELIEF**
**SALMON AND STEELHEAD CONSULTATION CLAIMS**

125.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

126.    Defendants have violated Sections 7 and 9 of the ESA and their implementing regulations with regard to their responsibilities over Snake River Chinook salmon, sockeye salmon, and steelhead in the Upper Salmon River Watershed.  These violations include, but are not limited to, the following:

A.    Defendants' violation of their duty to reinitiate consultation over the ongoing grazing authorizations (term permits and annual authorizations) and operation of recreation sites in the Upper Salmon River watershed identified above in paragraphs 120-121 in light of newly designated steelhead critical habitat, new information concerning impacts to salmon and steelhead, and changed circumstances in the watershed, including new events and activities that have occurred since the prior consultation as well as the failure to comply with the prior biological assessment and letter of concurrence, in violation of 50 C.F.R. § 402.16;

B.    BLM's and Forest Service's violation of their ESA duty to insure that their authorizations of livestock grazing identified in paragraph 120 above are not likely to jeopardize the continued existence of Snake River Chinook salmon, sockeye salmon, or steelhead or

adversely modify their critical habitat, in violation of 16 U.S.C. § 1536(a)(2);

C.      BLM's and Forest Service's violation of the ESA prohibition of unlawful "take" of Snake River steelhead and Chinook salmon by authorizing livestock grazing on the allotments identified in paragraph 120 above that harms or harasses threatened steelhead and salmon without any valid incidental take statement, in violation of 16 U.S.C. § 1538.

127.    This claim is brought pursuant to the judicial review provision of the ESA, 16 U.S.C. 1540(g).

128.    These violations of the ESA have caused substantial prejudice to Plaintiff's interests and allowed further harm to threatened and endangered salmon and steelhead and their critical habitat.

WHEREFORE, Plaintiff prays for relief as set forth below.

## SECOND CLAIM FOR RELIEF
## BULL TROUT CONSULTATION CLAIMS

129.    Plaintiff realleges and incorporates by reference the preceding paragraphs.

130.    Defendants have violated Sections 7 and 9 of the ESA and their implementing regulations with regard to their responsibilities over Columbia River bull trout in the Upper Salmon River Watershed.  These violations include, but are not limited to, the following:

A.      Defendants' violation of their duty to reinitiate consultation over the ongoing grazing authorizations (term permits and annual authorizations) and operation of recreation sites in the Upper Salmon River watershed identified above in paragraphs 120-121 in light of new information concerning impacts to bull trout and changed circumstances in the watershed, including new events and activities that have occurred since the prior consultation as well as the failure to comply with the prior biological assessment, letter of concurrence, and/or the 2000 Panther Creek biological opinion, in violation of 50 C.F.R. § 402.16;

B.     BLM's and Forest Service's violation of their ESA duty to insure that their authorizations of livestock grazing identified in paragraph 120 above are not likely to jeopardize the continued existence of bull trout, in violation of 16 U.S.C. § 1536(a)(2);

C.     BLM's and Forest Service's violation of the ESA's prohibition of unlawful "take" of Columbia River bull trout by authorizing livestock grazing on the allotments identified in paragraph 120 above that harms or harasses threatened bull trout without any valid incidental take statement, in violation of 16 U.S.C. § 1538.

131.     This claim is brought pursuant to the judicial review provision of the ESA, 16 U.S.C. 1540(g).

132.      These violations of the ESA have caused substantial prejudice to Plaintiff's interests and allowed further harm to threatened bull trout.

WHEREFORE, Plaintiff prays for relief as set forth below.

<u>**THIRD CLAIM FOR RELIEF**</u>
**WATER DIVERSIONS CONSULTATION CLAIMS**

133.     Plaintiff realleges and incorporates by reference the preceding paragraphs.

134.      Defendants have violated Sections 7 and 9 of the ESA and their implementing regulations with regard to their responsibilities over Snake River Chinook salmon, Snake River sockeye salmon, Snake River steelhead, and Columbia River bull trout in the Upper Salmon River Watershed.  These violations include, but are not limited to, the following:

A.     NOAA Fisheries' and Fish and Wildlife Service's failure to complete consultation over authorization of water diversions and rights-of-way on Forest Service land after the Forest Service initiated consultation over these actions in June 2004, in violation of 16 U.S.C. § 1536(a)(2);

B.     Forest Service's violation of its ESA duty to insure that the authorization of water

diversions and rights-of-way in the Upper Salmon River Watershed is not likely to jeopardize the continued existence of salmon, steelhead, or bull trout or adversely modify critical habitat, in violation of 16 U.S.C. § 1536(a)(2);

C.      Forest Service's violation of the ESA's prohibition of unlawful "take" of Snake River Chinook salmon, Snake River steelhead, or Columbia River bull trout by authorizing water diversions and rights-of-way in the Upper Salmon River Watershed that harm threatened salmon, steelhead, and bull trout without any incidental take statement, in violation of 16 U.S.C. § 1538.

D.      Forest Service's violation of its ESA duty to insure that, during the consultation process, it is not making any irreversible or irretrievable commitments of resources that would foreclose any reasonable and prudent alternatives, in violation of 16 U.S.C. § 1536(d).

135.    This claim is brought pursuant to the judicial review provision of the ESA, 16 U.S.C. 1540(g).

136.    In addition, or in the alternative, Plaintiff brings this claim against the Services pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(a)(1), based on their unreasonable delay and/or unlawful failure to act in completing consultation over the Upper Salmon River Watershed diversions.

137.    These violations of law have caused substantial prejudice to Plaintiff's interests and allowed further harm to threatened salmon, steelhead, and bull trout.

WHERFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A.      Adjudge and declare that Defendants are in violation of law, including by: (1) not reinitiating ESA consultation over impacts to Chinook salmon, sockeye salmon, steelhead, and

bull trout from the ongoing livestock grazing authorizations and operation of recreation sites identified above in paragraphs 120-121 in the Upper Salmon River Watershed; (2) not completing consultation over water diversions and rights-of-way on Forest Service land in the Upper Salmon  River Watershed; (3) not insuring that such actions are not likely to jeopardize Chinook salmon, sockeye salmon, steelhead, or bull trout or adversely modify their designated critical habitat; (4) causing unlawful take of Chinook salmon, steelhead, or bull trout from these actions; and (5) not preventing irreversible and irretrievable commitments of resources during the water diversions consultation process;

B.      Order Defendants to comply with the requirements of the ESA by promptly completing new, lawful consultation(s) and fulfilling their substantive duties under ESA Sections 7 and 9 to protect and recover threatened and endangered species;

C.      Issue such temporary, preliminary, and/or permanent injunctive relief as may specifically be requested hereafter by Plaintiff;

D.      Award Plaintiff its reasonable attorney fees, costs, and litigation expenses under the ESA, 16 U.S.C. § 1540(g), the Equal Access to Justice Act, and/or any other applicable provision of law; and

E.      Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein and to protect the interests of Plaintiff, the public, and the affected fish species.

Dated: September 30, 2010           Respectfully submitted,


    s/Lauren M. Rule                    
Lauren M. Rule
Attorney for Plaintiff